IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ASHLEY E. BRISCOE,
           Plaintiff,

                                        CV 10-119-PK

                                        FINDINGS AND
v.                                      RECOMMENDATION


MICHAEL J. ASTRUE,
Commissioner of Social Security,
                Defendant.
_____

PAPAK, Magistrate Judge:

       Plaintiff Ashley Briscoe filed this action on February 3, 2010, seeking judicial review of a

final decision of the Commissioner of Social Security finding her not disabled and not entitled to

disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This

court has jurisdiction over Briscoe's action pursuant to 42 U.S.C. § 405(g). Briscoe argues that

the Commissioner erred by improperly rejecting her testimony and the testimony of two

witnesses, Briscoe's naturopathic doctor and Briscoe's husband. I have considered all of the

Page 1 - FINDINGS AND RECOMMENDATION

parties' briefs and all of the evidence in the administrative record.  For the reasons set forth

below, the Commissioner's decision should be reversed and remanded for a finding of disability

and an award of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected . . . to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner has

established a five-step sequential process for determining whether a claimant has made the

requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§

404.1520(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only

at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v.

Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if

any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i).  If the ALJ finds that

the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.

*See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).  Otherwise,

the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii).  An impairment is

"severe" if it significantly limits the claimant's ability to perform basic work activities and is

expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also*

20 C.F.R. §§ 404.1520(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record.  *See* 20 C.F.R. §§ 404.1520(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. §§ 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the

---

[1]  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

Page 3 - FINDINGS AND RECOMMENDATION

claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level.  20 C.F.R. § 404, Subpt. P, App. 2.  The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made.  In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy.  *See Bowen*, 482 U.S. at 142;  *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c).  If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566.  A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

///

///

Page 4 - FINDINGS AND RECOMMENDATION

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Plaintiff Ashley Briscoe was born on March 6, 1980. Tr. 82. She graduated from high school and  college. Tr. 24. From approximately 1995 through 2005, Brisco worked in a variety of social services, education, administrative, and retail jobs. Tr. 111-112. Most recently, she was employed as a case manager at several social services non-profits. Tr. 111.

On October 21, 2006, Briscoe filed an application for Title II disability insurance benefits

Page 5 - FINDINGS AND RECOMMENDATION

alleging a disability onset date of March 22, 2006.  Tr. 12, 82-84.   Briscoe described her

disabling medical conditions as follows:

> fibromyalgia, depression, fatigue Pain all over my body in joints and muscles usually 6-7
> out of 10 sometimes worse. Unable to sit or stand for long period due to pain. Insomnia-
> wake frequently, trouble getting back to sleep. Fatigue- completely exhausted throughout
> day, feel weak, need to nap most days. Cognitive- memory problems, word-recall trouble,
> difficulty writing, speaking, concentrating. Frequent head aches, visual distortions,
> increased menstual [sic] pain, increased sensitivity to noise, temperature and light.
> Fibromyalgia and depression[.]

Tr. 100.  Briscoe noted that because of these conditions, she could not sit, stand, or work on a

computer for extended periods due to pain, could not lift or carry objects without pain, could not

stay awake throughout the day without resting, and had trouble concentrating, doing simple math,

remembering common words, and holding conversations.  *Id.*  Consequently, Briscoe reported

that when she was working, she took frequent breaks and laid down to combat pain and was

often absent due to pain and fatigue.  *Id.*

Briscoe's disability claim was denied initially on January 31, 2007, and again denied on

reconsideration on April 27, 2007.  Tr. 45,46.  On May 6, 2009, a hearing took place before

Administrative Law Judge (ALJ) Richard A. Say in Portland, Oregon.  Tr. 21-44.  On June 10,

2009, the ALJ issued a decision finding Briscoe not disabled.  Tr. 9-20.  Briscoe requested

Appeals Council review of the ALJ's decision, but that request was denied.  Tr. 1-4.  Briscoe

then initiated this suit on February 3, 2010.

## I.    Medical History

### A.    Depression and Pain

Briscoe's earliest relevant medical records date back to November 22, 2004, when

Briscoe sought treatment for depression from Dr. Maralyn Itzkowitz at Group Health Associates

in Cincinnati, Ohio.  Tr. 264.  Briscoe reported feeling depressed for the prior six weeks and told

Dr. Itzkowitz that she had been treated for depression in the past, including taking anti-

depressants while in high school.[2]  *Id.*  Dr. Itzkowitz prescribed Celexa, an antidepressant.  *Id.*

        In the middle of March, 2005, Briscoe was diagnosed with mononucleosis.  Tr. 254.  The

next month, on April 30th, 2005, Briscoe sought treatment for shoulder and neck pain.  Tr. 251.

In June, 2005, Briscoe returned to the doctor complaining of fatigue, problems concentrating, and

increased stress due to her boyfriend's job loss and their impending move to Oregon.  Tr. 245.

Briscoe's provider determined that Briscoe did not have mononucleosis, as previously believed,

but reaffirmed her diagnosis of depression.  *Id.*

        After moving to Oregon around July or August 2005, Briscoe reported worsening chronic

pain and depression.  Tr. 357.  On November 3, 2005, Briscoe told her primary care provider that

she had been experiencing aches, fatigue, fever, headaches, and trouble concentrating.  Tr. 353.

A week later, Briscoe's fever had subsided but she still felt fatigued.  Tr. 352.  The next month,

on December 14, 2005, Briscoe sought treatment for depression and requested different

depression medication.  Tr. 351.   Briscoe's primary care provider referred her for a mental health

evaluation to determine whether her chronic pain was related to her depression.  Tr. 357.  During

that evaluation on December 23, 2005,  Briscoe reported episodes of sadness several times a

week, frequent sleep disturbances, extreme fatigue, pain, decreased motivation, and diminished

word recall, concentration, and memory.  Tr. 358.  Briscoe explained that these symptoms were

interfering with both her work and personal life.  Tr. 357.  Briscoe also expressed uncertainty

---

        [2] Later, Briscoe also reported that she had been treated for depression from age 12 to 16.
Tr. 358.

about whether her depression was causing her pain or, conversely, whether her inability to determine the cause of her pain was exacerbating her depression.  *Id.*  Briscoe's response to questionnaires revealed mild anxiety symptoms and moderate depression symptoms.  Tr. 358.  Consequently, Briscoe was diagnosed with adjustment disorder with depressed mood and given a GAF score of 50.  Tr. 358.  Thereafter, Briscoe engaged in ongoing counseling concerning her pain and depression.  Tr. 347, 349.  Starting in February 2006, Briscoe also sought treatment from Julie Kahn, a naturopathic doctor.  Tr. 320-326.  She continued seeing Kahn regularly until late April 2006.  Tr. 303.

### B.  Fibromyalgia Diagnosis

On February 22, 2006, Briscoe was evaluated for a suspected fibromyalgia diagnosis.  Tr. 355-356.  In addition to her previously reported symptoms, Briscoe complained of headaches, pain in her eyes, frequent sore throats, and occasional chest tightness, nausea, and abdominal pain.  Tr. 356.  The rheumatologist performed a tender point exam on Briscoe, noting results of "1 to 2+" with tenderness at the base of the occiput, along the trapezium, over the neck and anterior chest, along the lateral hips, elbows, and knee soft tissues.  *Id.*  Laboratory tests and recent chest x-rays, however, were normal.  *Id.*  Overall, the rheumatologist found Briscoe's history and findings "consistent with fibromyalgia" and recommended Briscoe attend a series of classes on fibromyalgia for more instruction on how to manage her symptoms.  Tr. 356-357.

Starting on March 22, 2006, Briscoe took medical leave from her job as a case manager.  Tr. 302, 355.  She also engaged in pain management groups focusing on stretching, muscle relaxation, and other practices.  Tr. 344.  On April 12, 2006, Briscoe's naturopathic doctor filled out a certification for Briscoe's medical leave indicating that Briscoe suffered from a chronic

condition requiring treatment (fibromyalgia) and wrote that "it would be beneficial for [Briscoe] to work less than full time." Tr. 305.  The next week, Briscoe switched depression medications, but continued to report fibromyalgia, chronic pain, and insomnia.  Tr. 299.  She also agreed to have additional mental health counseling for her depression and pain management consultation for her fibromyalgia.  *Id.*  In June 2006, Briscoe asked her primary care physician to complete disability paperwork.  Tr. 343.

 By July 2006, Briscoe's pain was causing significant limitations in her daily activities. On July 21, 2006, Briscoe wrote a letter to Kahn describing her current symptoms and asking Kahn to fill out a form for income protection benefits.  Tr. 302.  In that letter, Briscoe described that her pain level ranged between five and seven and worsened with standing, walking, sitting for 20 minutes, or using the computer.  *Id.*  For example, Briscoe reported that "it is too painful to stand for the length of time it takes to brush my teeth."  *Id.*  Additionally, Briscoe wrote that her pain limited her mobility; on good days she was able to walk twenty to thirty minutes, but on bad days she was hardly able to leave the house.  *Id.*  On August 2, 2006, Kahn completed Briscoe's form, noting that Briscoe should not sit more than 20 minutes at a time or work more than five hours per day.  Tr. 301.

### C.    Prescription Pain Management

During a pain management consultation with Dr. Randy Krebs in August 2006, Briscoe described experiencing pain in her neck/head, shoulders, arms, low back, hips, and thighs.  Tr. 355.  She also complained of deep abdominal pain.  Tr. 340.  On average, her pain rated six out of ten, but fluctuated between four out of ten on good days and seven out of ten on bad days.  *Id.* Additionally, Briscoe could sleep only three to four hours a night and awoke every hour on the

Page 9 - FINDINGS AND RECOMMENDATION

hour.  *Id.*  Despite the pain, Briscoe reported still being able to carry out most of her household

duties.  *Id.*  An examination revealed tender points in all quadrants of the body consistent with a

fibromyalgia diagnosis.  *Id.*  Dr. Krebs prescribed gabapentin to control Briscoe's sleep disorder

and pain.  *Id.*

        A month later, Briscoe found that gabapentin relieved her pain somewhat and Dr. Krebs

suggested Tramadol, another pain medication, for further relief.  Tr. 340.  Briscoe expressed her

desire not to advance to opiate pain medication.  *Id.*  In October 2006, Briscoe found that

Tramadol was ineffective, but still resisted opiate medication.  Tr. 339.  Instead of prescribing

opiates, Dr. Krebs increased her dosage of gabapentin.  *Id.*  On December 5, 2006, as Briscoe's

pain persisted, Dr. Krebs again increased her gabapentin dose.  Tr. 337.  On January 30, 2007,

Dr. Krebs increased Briscoe's dosage of gabapentin yet again, this time to the maximum level.

Tr. 447.  Briscoe still declined opiate therapy, since she was just beginning a natural medicine

group suggested by her primary care physician for pain reduction.  *Id.*

        **D.      Daily Functioning**

        On November 28, 2006, Briscoe completed a Social Security function report describing

her daily activities and limitations at that time.  Tr. 132-147.  Briscoe's daily routine included

waking around noon, eating, stretching, light housework for about an hour, walking 20 to 30

minutes, resting several hours, napping for one or two hours, preparing dinner, spending time

with her fiancé, reading, and then going to bed between midnight and 2:00 AM.  Tr. 132.  She

took care of two cats, giving them food and water.  Tr. 133.  She sometimes cooked meals from

scratch, but when her pain was worse she made frozen dinners.  Tr. 134.  Again, depending on

her pain level, Briscoe completed between 20 minutes and two hours of light housework a day

such as dishes, tidying, sweeping, and laundry, taking breaks every 20 minutes to lay down and

rest. *Id.* Briscoe, however, could not do any vacuuming, scrubbing, or any other work that

required lifting, repetitive movement or bending over. Tr. 135.

Since Briscoe only had a learner's driving permit and felt that it was dangerous for her to

drive with her diminished concentration, she traveled either by public transportation, walking, or

bicycle for short distances. *Id.* While Briscoe's hobbies previously included hiking and

camping, she reported only being able to go on short, easy walks and only being able to camp at

drive-in spots for one night because of the pain caused by sleeping on the ground. Tr. 136.

Briscoe reported being limited to walking between 10 and 30 minutes before having to rest from

pain and fatigue. Tr. 137. She also stated she could lift 20 pounds briefly, but could not carry

that amount of weight or lift it repeatedly. *Id.*

Briscoe also reported that she had trouble keeping her train of thought, remembering

words, and concentrating on people talking. Tr. 137. For example, she described misspelling

words, forgetting common words such as "spoon" or "carpet," having difficulty completing

sentences, and struggling to do simple calculations, such as determining 20% of $10. Tr. 139.

Briscoe also noted that she was easily overwhelmed and frustrated by noise, light, movement,

and stress. Tr. 138-139. Overall, Briscoe emphasized that her mental and physical functioning

varied each day, and even within the day, based on her pain level and fatigue. Tr. 139.

### E.    State Agency Medical Assessments

On January 29, 2007, medical consultant Martin Kehrli, M.D. summarized Briscoe's

records and opined that her "reported limitations were not fully supported by or consistent with

the medical findings." Tr. 432. Thus, Dr. Kehrli assessed Briscoe with the physical residual

functional capacity to occasionally lift or carry 20 pounds, frequently lift 10 pounds, stand and/or

walk and sit about six hours in an eight hour workday, and push/pull with no limitations.  Tr.

428.  The same day, Frank Lahman, Ph.D., assessed Briscoe's mental residual functional

capacity, opining that she had the ability to understand and remember simple instructions and to

persist at simple tasks for a normal workday/workweek with minimal public and co-worker

contact.  Tr. 437.  On April 26, 2007, two different state agency medical consultants reviewed

Briscoe's records and recommended affirming the denial of Briscoe's disability claim.  Tr. 451-

452.

      **F.**      **Transition to Opiate Pain Medication**

 By April 3, 2007, Briscoe's maximum gabapentin dosage had proved ineffective in

reducing her pain, she had stopped attending the natural medicine group, and she opted to begin

taking methadone.  Tr. 446.   After approximately one month of gradually increasing methadone

doses, Briscoe's pain had not diminished.  Tr. 695.   By May 22, 2007, almost two months after

beginning methadone, Briscoe still reported no reduction in pain.  Tr. 691.  She also experienced

unpleasant side effects, including painful constipation, hallucinations, and night-time delirium.

Tr. 177, 691.  Consequently, Dr. Kreps and Briscoe decided to taper off methadone.  *Id.*  In a

follow-up questionnaire for her Social Security Appeal on May 25, 2007, Briscoe reported that

her fatigue had increased since her last report in November 2006.  Tr. 176.  Briscoe described a

"general lessening of activity, fewer hours awake each day [,] less productive, less energy when I

am awake, spending 12 hours in bed a night sleeping / or delirious [and] napping 2-3 hrs daily."

Tr. 176.  Briscoe explained that her pain had also escalated to the "higher level of my usual

spectrum – pain usually between 5 - 7 on painscale – sometimes 8," despite taking up to 45 mg.

per day of methadone.  Tr. 177.

On June 16, 2007, Briscoe sought urgent care related to her methadone tapering, reporting increased pain and shakiness.  Tr. 687.  At Briscoe's request, the doctor prescribed Robaxin, a muscle relaxant.  *Id.*  The muscle relaxants did not work, and four days later Briscoe went to urgent care again, complaining of further methadone withdrawal symptoms, including pain, insomnia, and "creepy crawly" sensations in her legs.  Tr.  684.  Because Briscoe's wedding was to occur two days later, she requested that methadone tapering be curtailed until she returned from her honeymoon.  Tr. 685.

By September 2007, Briscoe had completely weaned off Methadone, but requested Vicodin and Robaxin for pain.  Tr. 681.  That medication regime gave Briscoe some relief, reducing her pain levels by one to two points.  Tr. 680.   Although Briscoe had stopped taking Vicodin daily by January 2008, Tr. 670, she had to increase her consumption in March 2008 after beginning to experience bilateral hip pain.  Tr. 667.   Briscoe's primary care provider referred her to physical therapy and ordered x-rays.  Tr. 668.

### G.    Symptom Journal

In addition to the medical documentation, the administrative record includes a detailed log that Briscoe kept of her daily symptoms covering January to February of 2006, and November 2007 through May of 2008.  Tr. 542-590.   This log demonstrates Briscoe's persistent struggle with fibromyalgia, depression, and insomnia.  For example, in January 2006, Briscoe described hallucinations (walls moving, trails from hand movements), problems with writing the wrong letters and words, and forgetfulness.  Tr. 543.  In February and March 2006, Briscoe noted that her high pain level prevented her from standing for any length of time or walking more than

twenty or thirty minutes.  Tr. 545.  She also described being so tired during the day that she had

to take a nap.  *Id.*

In November 2007, Briscoe continued to record the daily effects of her conditions.  For

example, she tried to carry a frozen pizza and a quart of milk home from the grocery store, but

the pain prevented her from doing so.  Tr. 546.  Walking 30 minutes caused her to be light-

headed and tired; she had to nap and rest for the remainder of the day.  *Id.*  She could not

remember the family relationship between her sister-in-law and her husband's stepfather.  *Id.*

Walking for 30 minutes and standing for 30 minutes created a pain level of eight out of ten and

prevented her from doing anything else for the rest of the day.  Tr. 547.

In January 2008, a typical entry stated: "Pain 8.  Stretched, did dishes, rested, walked 15-

20 min. (legs & back hurting)[,] took a nap, laid with heating pad, cooked 15 min., layed down

again with heating pad, took a hot bath, laid with heating pad, pain 8, very painful to stand for

any amount of time or to walk around apartment or sit for any amount of time, have to lay with

heat[,] took a muscle relaxer before bed."  Tr. 557.  As another example, that same month

Briscoe wrote: "still feeling depressed– every little thing frustrates & irritates me– dropping a can

on the way to recycling, the hangers getting tangled in the closet– it all seems like too much to

handle[.] Walked 20-30 min today, rested, cleaned for 20 min[,] read newspaper for ~ 1 hr.

which made my shoulders hurt, cleaned for 30 min., laid down, cooked ~ 30 min."  Tr. 561.

### H.    Vocational Rehabilitation and Mental Health Treatment

Starting in March 2008, Briscoe engaged in vocational rehabilitation, including

simultaneous mental health treatment.  Briscoe was assigned by the Office of Vocational

Rehabilitation Services to receive job development services from Integration & Independence,

Inc., with the goal of finding a ten hour per week position.  Tr. 517.  During the last week of

March, Integration & Independence offered to employ Briscoe as an on-call receptionist in its

office and she worked a single three and a half hour shift that week.  Tr. 510, 518.   After initially

committing to cover another shift on April 17, 2008, Briscoe had to cancel because of her

fibromyalgia.  Tr. 511.  Briscoe worked for three and a half hours answering phones on May 7,

2008, but declined another shift on May 8th because she was too sore from the working the

previous day.[3]  Tr. 509.  This pattern repeated the next week, with Briscoe working one day, but

turning down further shifts due to fatigue.  Tr. 503.

Consequently, on May 16, 2008, Briscoe's vocational rehabilitation counselor explained

that she was terminating Briscoe's job search because "it just doesn't seem feasible to find

anything that will fit your stamina."  Tr. 504.  Briscoe agreed with that decision, explaining that

even though she took breaks to walk around and stretch, her pain was "very bad"  by the end of

her first three and a half hour shift and remained that way for the next two days.  *Id.*

Nevertheless, Briscoe expressed a desire to "work as much as I am able" and indicated that she

would keep working weekly shifts as a receptionist at Integration & Independence.  *Id.*

Summarizing Briscoe's case, Briscoe's rehabilitation counselor wrote: "I discontinued job

development at the end of May because [Briscoe] could not maintain more th[an] the 3 hours

---

[3] An entry from Briscoe's symptom journal from May 7, 2008 describes her difficulty in even working a three and a half hour shift: "stretched, walked ~10 min, went to work- sat for 3 1/2 hrs., came home napped, laid with heating pad, took pain meds [and] laid the rest of the night. Work was difficult[,] painful to my hips, back [and] shoulders[,] was pretty unbearable by the end- last 45 min or so[.] Took breaks every 30 min or so to stretch [and] walk around but at the end couldn't sit any more[,] had to stand [and] walk around for last 15 min to get through it[,] had to lay down from 4:30 (when I got home) til bed, pain 7, 6 with pain meds."  Tr. 583.

work she does for Integration and Independence answering phones.  She has been asked to work more days/hours but she declines because of pain.  It seems [Briscoe] is at the limit of her endurance for work."  Tr. 502.

Meanwhile, from March to June 2008, Briscoe engaged in mental health treatment with Noreen Riordan, Ph.D., a clinical psychologist.  At initial evaluation, Briscoe reported numerous symptoms, including extreme sadness, trouble concentrating, memory problems, lack of energy, sleeplessness, and pain.  Tr. 491.  Riordan also noted that Brisco experienced "brain fog," which caused her to be forgetful and lose her train of thought.  *Id.*  While Briscoe appeared depressed and blunted consistently through her treatment, Riordan never found Briscoe to exhibit lessened awareness, memory deficiencies, disorientation, delusions, or hallucinations.  Tr. 485,473,475, 479, 487, 489.  Nevertheless, in an evaluation dated April 30, 2008, Riordan noted moderate concentration and memory problems, and gave Briscoe a GAF score of 55.  Tr. 482.  Briscoe eventually discontinued treatment with Riordan on July 1, 2008, stating that she was "doing much better."  Tr. 470.

In September 2008, after a three month hiatus in contact, Briscoe left a message with her vocational rehabilitation counselor indicating that she would be seeking employment providing childcare for her friend, but that if the childcare opportunity did not work, she would try to resume vocational services.  Tr. 496.  In the end of October 2008, Briscoe confirmed that she was providing childcare for her friend despite having problems with her back and hip, and that she did not feel that she could be looking for work "at this time."  Tr. 496.  Consequently, Briscoe's counselor closed her case with the Office of Vocational Rehabilitation Services, explaining that

Page 16 - FINDINGS AND RECOMMENDATION

Briscoe had "other commitments" and that "looking for work at this time is not a priority." Tr. 495.

### I.    Physical Therapy

After experiencing new pain symptoms in her hips in March 2008, Briscoe also began physical therapy. When first visiting the physical therapist on May 5, 2008, Briscoe reported being limited to ten minutes of walking daily and requiring increased periods of lying down rest. *Id.* The physical therapist identified a provisional diagnosis of bilateral hip pain, but noted that the diagnosis was inconclusive, since Briscoe's pain might also be caused by fibromyalgia exacerbation or greater trochanteric bursitis. Tr. 665. The therapist also opined that Briscoe's rehabilitation potential was fair, but acknowledged that her "overlying fibromalygia [diagnosis]" might influence the length of her treatment. *Id.* The therapist prescribed a home exercise program and sketched a course of treatment involving four to eight visits. Tr. 664-665.

During her June 4, 2008 appointment, Briscoe stated that she had to lie down most of the day, could only tolerate 10 minutes of walking per day, and woke up two to six times per night. Tr. 661. The therapist again noted that it was unclear whether Briscoe's pain resulted from fibromyalgia or was "mechanical," and changed Briscoe's home exercise program to determine if extension exercises would improve her pain. *Id.* At her next visit on June 13, 2008, however, Briscoe reported doing better, and the therapist noted that Briscoe needed to increase her activity level and continue to work on her posture. Tr. 654. During Briscoe's next visit, the therapist clarified Briscoe's diagnosis as "posterior derangement for [thoracic spine] - responding to ext[ension]" and encouraged Briscoe to increase her activity level, despite Briscoe's reports of

pain in her hips and rib cage.  Tr. 647.  At the next visit, Briscoe reported slight reductions in

pain and the physical therapist encouraged Briscoe to increase her walking to one hour a day,

three to four times a week.  Tr. 642.  However, on September 16, 2008, Briscoe reported a flare-

up in her pain after she traveled by car and airplane.  Tr. 639-640.  At the advice of her physical

therapist, Briscoe then sought treatment from a chiropractor.  Tr. 632, 635.  By October 1, 2008,

Briscoe's pain had again diminished somewhat, although Briscoe still reported pain levels of four

or five out of ten.  Tr. 632.  Briscoe's therapist noted that she was "entrenched [in] pain

behavior" and had "very poor endurance from deconditioning due to pain and fear of pain."  Tr.

633.  By October 22, 2008, Briscoe remained at a pain baseline of four out of ten, although her

pain increased when sitting.  Tr. 627.  Briscoe tolerated exercise without increased symptoms,

but still needed more encouragement to continue exercising.  Tr. 628.

At her final therapy visit on November 12, 2008, Briscoe reported pain levels of six out

of ten and complained of increased pain after exercise.  Tr. 621.  Apparently, only one of the

many prescribed exercises helped relieve her pain.  Tr. 623.  Briscoe's physical therapist wrote

that Briscoe was "only semi compliant with [her] exercise program, so I am not sure [t]hat she

got the full benefit from mechanical therapy."  *Id.*  The therapist reiterated that Briscoe's pain

behavior was entrenched, noted that she made "very little progress with [physical therapy]," and

discharged her.  *Id.*

### J.    Alternative Treatments

Throughout 2007 and 2008, Briscoe also engaged in a number of alternative approaches

to treating her fibromyalgia.  From June 2007 until October 2008, Briscoe visited Brooklyn

Community Acupuncture eleven different times.  Tr. 493-494.  Briscoe also was treated by the
Oregon College of Oriental Medicine on seven occasions between August and October 2007.  Tr.
457-469.  Finally, Briscoe also received six chiropractic treatments between August and
November 2008.  Tr 594-610.

### K.    Further Pain Management

On December 3, 2008, Briscoe had another consultation with Dr. Kreps for fibromyalgia
medicine management and to treat new pain "exacerbated in the lumbar area."  Tr. 619.  Dr.
Kreps examined Briscoe, finding multiple tender points in all quadrants consistent with
fibromyalgia.  *Id.*  He also discovered that although Briscoe had some tenderness in the lower
lumbar spine area, she was able to extend, rotate, and tilt her lumbar spine without any pain.  *Id.*
Dr. Kreps reconfirmed a diagnosis of fibromyalgia and chronic pain syndrome secondary to
fibromyalgia and started Briscoe on trials of Lyrica, a pain medication used to treat fibromyalgia,
and Percocet, a narcotic pain reliever.  *Id.*  Although Briscoe reported some temporary pain relief
from Percocet on January 6, 2009, by February 3, 2009, she told Dr. Kreps that Percocet no
longer seemed to help reduce her pain.  Tr. 611, 616.  Moreover, Briscoe was unsure that Lyrica
was helping and also had to reduce her consumption of that drug due to side effects.  Tr. 611.  In
response, Dr. Kreps suggested a trial of morphine.  *Id.*

## II.    Hearing Testimony and Submissions

### A.    Briscoe

During a hearing before the ALJ on May 6, 2009, Briscoe described the daily fluctuations
in her symptoms and limitations.  Tr. 28.  On better days, Briscoe said she experiences level five

pain and is able to do light housework such as dusting and putting things away, and to wash

dishes in five minute increments. Tr. 29. On her worst days, Briscoe reported "not able to do

much of anything;" she lays on the couch because even walking around the apartment is painful.

*Id.* These bad days generally occur several days a week. Tr. 31. But, if Briscoe over-exerts

herself by not napping during the day, walking for more than 20 minutes, sitting for a prolonged

time, lifting, or doing repetitive motions, she can have such bad days "every day." *Id.*

Briscoe also described how pain limits her ability to engage in various physical activities.

If she is having a bad day, Briscoe can only sit for five to ten minutes before having to get up and

move around. Tr. 34. Otherwise, Briscoe can sit for 20 to 30 minutes at a time. *Id.* On bad

days, Briscoe can only tolerate standing in one place for a few minutes, while on good days she

can stand for 10 to 20 minutes, especially if she moves around. Tr. 35. On bad days, Briscoe can

walk for only five minutes, but on good days she can walk for 20 minutes. *Id.* Her pain also

prevents her from carrying more than a few pounds and lifting more than 10 pounds. Tr. 34. In

addition to her nap during the day, Briscoe spends hours laying down and reclining, since that is

her most comfortable position. Tr. 36.

Briscoe explained that her concentration and memory are also compromised. Tr. 32. She

loses focus on what others are saying and is easily distracted by any kind of background noise,

like television or music. *Id.* Moreover, she forgets common words and the names of people she

has known for a long time. *Id.*

Briscoe also described the effect of her most recent treatment regimen. Tr. 33. Although

morphine helps somewhat to reduce the baseline pain level, it has not made a large difference

Page 20 - FINDINGS AND RECOMMENDATION

and Briscoe's pain remains in the range of five to seven out of ten.  *Id.*

Finally, Briscoe explained how her symptoms affected her ability to work.  Tr. 38-39.
She took medical leave in March 2006 because she was missing work frequently, either calling in
sick, coming to work late, or leaving early.  Tr. 39.  She and her employer agreed that she should
take a medical leave, but because her symptoms did not improve, she eventually resigned.  *Id.*

### B.    Vocational Expert

The ALJ posed a hypothetical to the vocational expert (VE) concerning an individual
limited to light exertional level activities with the mental functional capacity to carry out short
simple instructions and have minimal interaction with coworkers and the public.  Tr. 41.  The VE
opined that such an individual could perform production work and housekeeping cleaning work.
Tr. 42.  The ALJ also posed a second hypothetical based on the symptoms and limitations
expressed by Briscoe in her hearing testimony.  *Id.*  The VE opined that an individual such as
Briscoe could not perform any job at any exertion or skill level because of "medication side
effects, a need to take multiple days off of work per month, trouble with recall and a low energy
level."  *Id.*  Finally, the VE confirmed that an individual who had to miss more than two days a
month from work due to symptoms and limitations would not be able to sustain competitive
employment.  Tr. 43.

### C.    Poire-Odegard

Briscoe's husband, Peter Poire-Odegard, submitted a letter prior to Briscoe's hearing
describing some of the changes in Briscoe's life caused by her fibromyalgia.  Tr. 720. When he
first met Briscoe nine years ago, she was an intern at an organic farm harvesting and planting

crops by hand.  *Id.*  Briscoe and Poire-Odegard would go camping and hiking almost monthly.

*Id.*  Now, Briscoe can no longer even take the bus for transportation, she has to nap after walking

only 10 blocks, and the couple has gone camping only once in the past two years.  *Id.*  Further,

Briscoe's pain varies daily; on good days she can do dishes, clean the cat litter, tidy the house,

and pay bills, but on bad days she remains in bed with pain.  *Id.*  Briscoe is also continually

distracted, slow to communicate, forgetful of instructions, and dangerously unaware when

crossing streets.  *Id.*  Because of her limitations, the couple limits social outings and must reserve

a week of recovery time after traveling out of the state.  *Id.*  In sum, Poire-Odegard described

Briscoe as "a very different person now" compared to when he first met her.  *Id.*


## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found that Briscoe did not engage in substantial gainful activity since her alleged onset

date of March 22, 2006.  Tr. 14.  He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Briscoe's medical impairments of depression and

fibromyalgia were "severe" for purposes of the Act.  Tr. 14.  Because the combination of

impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Briscoe's impairments was the equivalent of

any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  Tr. 13.  The ALJ

therefore properly conducted an assessment of her residual functional capacity.   Specifically, the

ALJ found that Briscoe had the residual functional capacity to:

perform a limited range of light work as defined in 20 CFR 404.1567(b). She can lift 10 pounds frequently and 20 pounds occasionally and she can stand and walk for about 6 hours in an 8 hour day. She can understand, remember, and carry out simple instructions. She is able to persist at simple tasks for a normal work day and week. She should have minimal contact with co-workers and the general public.

Tr. 16.

At the fourth step of the five-step process, the ALJ found in light of her RFC that Briscoe was unable to perform her past relevant work. Tr. 18.

At the fifth step, the ALJ found in light of Briscoe's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform. Tr. 19. Relying on the testimony of a vocational expert, the ALJ cited examples of light-exertional jobs that Briscoe could perform despite the limitations listed in her RFC, such as production worker and housekeeper. Tr. 19. Based on the finding that Briscoe could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that she was not disabled as defined in the Act from March 22, 2006 through the date of the decision, June 10, 2009. Tr. 19-20.

## ANALYSIS

Briscoe challenges the ALJ's decision on two main grounds. First, she asserts that the ALJ erred by failing to give sufficient reasons to reject Briscoe's testimony. Second, she argues that the ALJ failed to give sufficient reasons for rejecting the statements from Briscoe's naturopathic doctor and from her husband.

## I.        Briscoe's Testimony

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 C.F.R. § 404.1529. In weighing a claimant's credibility, the ALJ conducts a two-part analysis. In the first part, the claimant "must produce objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of symptom. *Tommasetti v. Astrue*, 533 F.3d 1035, 1939 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996). If the claimant meets this threshold and there is no affirmative evidence of malingering, the ALJ moves to the second part of the analysis. There, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering *specific, clear and convincing reasons* for doing so." *Id.*, *quoting Smolen*, 80 F.3d at 1281, 1283-84 (emphasis added). In evaluating a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997). In the event the ALJ determines that the claimant's report is not credible, such a determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en

*banc*).

Here, in the first part of his credibility analysis,  the ALJ found that Briscoe's impairments could have been expected to cause some of her symptoms.  Tr. 17.  In the second part, the ALJ determined that Briscoe's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible for three separate reasons.  I analyze each of these reasons below and find that none are sufficiently specific, clear and convincing to justify rejecting Briscoe's testimony about the severity of her symptoms.  Tr. 17-18.

**A.    Lack of Functional Limitations**

The ALJ's first reason for rejecting Briscoe's testimony was that, aside from trigger point tenderness, "there are few other findings in the extensive treatment history that indicate functional limitations."  Tr. 17.  The ALJ cited a number of examples drawn from medical examinations supposedly indicating that Briscoe's fibromyalgia did not restrict her functioning: (1) Briscoe was able to extend her lumbar spine without pain; (2) Briscoe had a negative straight leg raise test; (3) Briscoe could bend and touch her toes; (4) Briscoe had normal gait and was able to balance all her weight on both toes; (5) Briscoe had normal strength and reflexes in her extremities; (6) Briscoe had no guarding or problems with mobility; (7) Briscoe "was pleasant and appeared comfortable;" (8) Briscoe "was pleasant and alert and [] reported that she was doing fine;" (9) "multiple examinations found that [Briscoe] was in no acute distress;" and (10) Briscoe "seemed to manage her pain at least partially with medication and exercise." *Id.*  The ALJ also reached a similar conclusion concerning the lack of functional limitations stemming from Briscoe's depression.  *Id.*  The ALJ erred in two different ways by relying on the purported

lack of objective medical findings of Briscoe's functional limitations.

First, contrary to ALJ's account, the record includes objective medical findings confirming Briscoe's physical functional limitations, including decreased range of motion and muscle weakness.  For example, in Briscoe's initial physical therapy evaluation, her therapist noted "general decreased [range of motion] at hips, knees, and ankles, sl [sic] shuffle, shortened steps." Tr. 664.  In subsequent treatment sessions, the therapist observed minor movement loss with bilateral hip extension, Tr. 664, weak bilateral flexion and extension in resistance testing, Tr. 664,  minor movement loss in mid-back flexion, extension and sidegliding, Tr. 661,  minor movement loss with flexion, Tr. 632, and "weakness in hip abduction and extension."  Tr. 622. These are exactly the types of objective medical findings that the Social Security regulations instruct adjudicators to rely upon when analyzing a claimant's pain-related functional limitations. 20 C.F.R. §404.1529(c)(2) ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of *reduced joint motion*, muscle spasm, sensory deficit or *motor disruption*. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.") (emphasis added).

Additionally, although not necessary to my analysis, I cannot help but notice that one of the justifications offered by the ALJ to prove Briscoe's lack of functional limitations is particularly unconvincing.  The record simply does not bear out the ALJ's assertion that "claimant seems to manage her pain at least partially with medication and exercise."  Tr. 17.

Since at least August 2006, Briscoe sought trials of increasingly stronger pain medications, some of which gave her temporary relief but eventually either ceased being effective or caused intolerable side effects.  Even as recently as her hearing in May 2009, Briscoe reported a baseline pain level of five to seven, despite taking morphine, an opiate pain reliever.  Moreover, Briscoe's six month course of physical therapy did little to reduce her pain and her regular stretching, detailed in her symptom log, did not prevent her from experiencing pain levels as high as eight out of ten.  Briscoe's constant yet ineffectual search for pain relief actually supports her credibility, not undermines it.  *See* S.S.R. No. 96-7p, 1996 SSR LEXIS 4, at *21 ("Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.")

Even if the record lacked objective evidence of Briscoe's functional limitation– which it does not– the ALJ would still have erred in relying on that absence to discredit her testimony.  Social Security Ruling 96-7p provides that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  S.S.R. No. 96-7p, 1996 SSR LEXIS 4, at *3.  Thus, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a

Page 27 - FINDINGS AND RECOMMENDATION

finding on the credibility of the individual's statements based on a consideration of the entire case

record." *Id.* at *6.  More specifically, an ALJ must examine the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*  at *8.  As the ruling makes clear, when a claimant alleges limitations from severe pain, the

ALJ must go beyond objective medical evidence to properly evaluate the claimant's credibility.

**B.    Daily Activities**

The ALJ's second reason for discrediting Briscoe's testimony was that her daily activities

were inconsistent with her reported limitations.  In support, the ALJ noted that Briscoe does

household chores, cooks, walks, goes shopping, visits friends, takes care of her cats, and can go

on overnight car camping trips.  Tr. 17.  Although the record clearly reflects that Briscoe engages

in such activities, the ALJ improperly relied on that conduct to reject Briscoe's testimony.

An ALJ may look to testimony of a claimant's daily activities to support a finding that

subjective pain complaints are not credible.  *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 n.2 (9th

Cir. 1990).  If, despite her claims of pain, "a claimant is able to perform household chores and

other activities that involve many of the same physical tasks as a particular type of job, it would

not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Id.*, *quoting Fair v. Bowen*, 885 F.2d 597, 602 -04 (9th Cir. 1989). Yet, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, . . . and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id; see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled.") (citations omitted). For example, a claimant may have the capacity to travel periodically, cook meals, and wash dishes and still be prevented from working. *Fair*, 885 F.2d at 603. Thus, "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Gonzalez*, 914 F.2d at 1201. Therefore, Ninth Circuit precedent suggests that an ALJ may only discredit a claimant's pain testimony by specifically finding both that: (1) the claimant spends a substantial part of her day engaged in daily physical activities; and (2) those activities are of the same type that the claimant would use in a work setting.

Here, the ALJ failed to make specific findings that Briscoe spends a substantial part her day engaged in functions involving physical activity that are also transferable to the workplace. In fact, the record shows that Briscoe's daily physical activity was insubstantial and limited to light domestic chores. For example, Briscoe testified at her hearing that on good days she could

do some light housework and wash dishes in five minute increments, but that on bad days, which occurred approximately three times a week, she could not perform any housework.  Even in November 2006, when her symptoms were somewhat less severe, Briscoe described performing between 20 minutes and two hours of chores, yet having to take lying down rest breaks every 20 minutes to avoid hurting herself.  Similarly, Briscoe prepared meals when she was able, but merely heated frozen meals when she was in too much pain.[4]  Briscoe's endurance for walking was also limited; she testified that could walk for 20 minutes on good days, but only five minutes on bad days.  Moreover, Briscoe did some of her own shopping, but could not carry more than a few items at a time due to their weight.  And, while Briscoe originally reported being able to camp overnight as of November 2006, her husband's letter from April 2009 mentioned that the couple had gone camping only once in the past two years.  In sum, Briscoe's daily routine consists mainly of resting, napping, and non-physical pursuits punctuated with short periods of limited physical activity.  In this case, Briscoe's daily activities are, in the words of the Ninth Circuit, "quite limited and carried out with difficulty."  *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) (holding that ALJ erred in discrediting pain testimony and crediting that evidence

---

[4] The ALJ observed that Briscoe reported eating meals at restaurants when her pain was bad, and therefore concluded that she "seems to maintain a significant level of functioning even during flare-ups . . . ."  Tr. 17.  The ALJ's conclusion ignores the Ninth Circuit's standard for determining when a claimant's pain testimony may be disregard based on the claimant's daily activities.  *See Gonzalez*, 914 F.2d at 1201 ("if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain.").  Eating out at a restaurant is not necessarily a physical function.  Moreover, Briscoe did not spend a substantial part of her day eating in restaurants.  Finally, eating in restaurants is not an activity which transfers to the work setting.

as true).  Thus, the ALJ's second justification for rejecting Briscoe's testimony is unsupported by substantial evidence and contrary to Ninth Circuit case law.

### C.      Inconsistent Statements

The ALJ's final reason for rejecting Briscoe's testimony was that "inconsistent statements from [Briscoe] may indicate credibility concerns."  Tr. 17.  Specifically, the ALJ observed that: (1) Briscoe alleged her impairments kept her from working, but vocational rehabilitation records actually indicated that working was not a high priority for her; (2) Briscoe resisted some physical therapy exercises because they were too painful but later did those exercises with no increase in pain; and (3) Briscoe was "not entirely compliant" with her physical therapy treatment.  Tr. 17. These purported inconsistencies, however, are not borne out by the record in this case.

"In determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001)).  For instance, "if a claimant has a reputation as a liar, or has made prior statements inconsistent with his claim of pain, or is found to have been less than candid in other aspects of his testimony, that may be properly taken into account in determining whether or not his claim of disabling pain should be believed."  *Fair*, 885 F.2d at 604 n.5.

A complete examination of Briscoe's vocational rehabilitation records indicates that she wished to work, but was hampered by her fatigue and pain symptoms.  At the outset, Briscoe's vocational goal was to find a job for 10 hours per week.  From late March through the middle of

Page 31 - FINDINGS AND RECOMMENDATION

May 2008, however, Briscoe worked weekly three and a half hour shifts as a receptionist, but found herself too exhausted and distressed following those shifts to work additional hours. Consequently, Sandy Gooch, Briscoe's vocational counselor called off Briscoe's job search, observing that "it just doesn't seem feasible to find anything that will fit your stamina." Tr. 504. Nevertheless, Briscoe expressed her desire to continue her weekly shifts, since the job was "a good fit for me because it is very relaxed and the work itself is easy and they know and understand my disability." Tr. 504. Subsequently, Briscoe's journal and vocational rehabilitation records indicate that she worked on May 21, 2008, but cancelled her shift on May 28, 2008 due to pain. Tr. 500, 586, 588. Throughout her job search, Briscoe's job developer noted that Briscoe showed an interest in being employed. Tr. 499, 506, 517.

At the end of May 2008, Diane Dobslaw closed Briscoe's job development file, but Briscoe's vocational rehabilitation services continued, since she apparently received reimbursement for her mental health counseling through the Office of Vocational Rehabilitation Services. Tr. 498, 501. Several months later, Briscoe reported to her vocational counselor that she was pursuing work watching a friend's child, and consequently, that she would not be needing assistance from the Office of Vocational Rehabilitation Services.[5] Tr. 496. Briscoe mentioned, however, that if the childcare fell through, she would resume services. The next month, Briscoe agreed that the Office of Vocational Rehabilitation Services should close her file, since she was indeed providing some childcare and could not look for additional work. *Id.*

---

[5] There is no indication in the record that Briscoe's childcare duties were extensive or reflected an ability to return to full gainful employment.

Although the vocational counselor's closing letter stated that "looking for work at this time is not a priority" for Briscoe, Tr. 495, the whole record shows that Briscoe no longer sought vocational services because she had obtained other suitable employment, not because she wished to avoid working. Thus, contrary to the ALJ's statement, Briscoe's vocational rehabilitation activity does not contradict her allegations that her pain and fatigue prevented her from working more than a few hours per week.

Briscoe's resistance to certain exercises during one of her physical therapy treatments does not amount to an inconsistent statement detracting from her overall credibility. Citing a particular physical therapy note, the ALJ stated that Briscoe "also resisted physical therapy exercises because she insisted they were too painful; however, she subsequently did the exercises with no apparent increase in pain." Tr. 17-18. As an initial matter, the ALJ's summary of the physical therapy note is arguably inaccurate. The note actually states that Briscoe "[d]id not want to exercise because of pain in her hips– but did exercise without increased symptoms." Tr. 628. Thus, the note suggests that Briscoe's overall hip pain made her fearful of exercising during that visit, not that Briscoe affirmatively exaggerated her pain level to the physical therapist. Moreover, even if I accept the ALJ's characterization of the record as at least plausible, this evidence hardly qualifies as clear and convincing evidence impugning Briscoe's credibility. After all, there is much evidence in the record that Briscoe's pain levels fluctuated daily. Therefore, Briscoe could have truthfully experienced increased pain from the exercise one day, but then felt no increased pain during her therapy visit.

Finally, Briscoe's lack of complete compliance with her physical therapy home exercise

program does not reduce her credibility.  Social Security Ruling 96-07p stresses that adjudicators must first consider the underlying reasons why a claimant does not follow prescribed treatment before inferring a lack of credibility.  *See* S.S.R. No. 96-7p, 1996 SSR LEXIS 4, at *22-23 ("the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed *and there are no good reasons for this failure*. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.") (emphasis added).  Yet, the ALJ nowhere considered potential explanations for Briscoe's level of compliance with her physical therapy exercises.  In fact, the record shows that, of the numerous exercises prescribed by the physical therapist over the six-month treatment period, "[n]o exercise except head over the table helped relieve pain." Tr. 623.  In other words, Briscoe had at least one good reason for her semi-compliance: the prescribed treatment was ineffective.

Additionally, Briscoe's credibility is bolstered by the medical record as a whole, which demonstrates that she diligently sought pain treatment and followed her providers' treatment recommendations.  *See* S.S.R. No. 96-7p, 1996 SSR LEXIS 4, at *21 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the

credibility of the individual's statements.")  Other than the single reference to Briscoe's semi-compliance with physical therapy exercises, Tr. 623, there is only one other instance in over three years of extensive medical history where Briscoe failed to comply completely with recommended treatment.  In April 2006, Briscoe was prescribed nortriptyline for her fibromyalgia.  Tr. 299.  But, June 2006 notes from Briscoe's primary care provider indicate she "[s]topped nortriptyline because it didn't work, but then she did not take the required dose for her fibromyalgia pain."  Tr. 343.  A pain management consultation two months later, however, suggests a legitimate reason for discontinuing that medication: "[s]he has tried nortriptyline but this caused her to be depressed."  Tr. 341; *see* S.S.R. No. 96-7p, 1996 SSR LEXIS at *23 (listing medication side effects as one explanation for failure to take a prescription that provides insight into an individual's credibility).  Overall, the ALJ improperly failed to consider Briscoe's good reasons for her limited medical non-compliance and ignored Briscoe's extensive record of seeking and following prescribed treatment.

In sum, the ALJ failed to provide specific, clear and convincing evidence to reject Briscoe's testimony.  First, the ALJ overlooked clear objective findings of Briscoe's reduced range of motion and weakness and improperly focused on the purported lack of objective medical evidence of functional limitations as an independent measure of Briscoe's credibility.  Second, the ALJ improperly concluded that Briscoe's daily activities were inconsistent with her alleged limitations by applying the wrong legal standard.  Third, the ALJ improperly identified apparent inconsistent statements by either failing to examine the whole record or failing to consider the legitimate reasons for Briscoe's actions.  Finally, the ALJ's reliance on these three justifications

for discrediting Briscoe's testimony was not harmless error, since the ALJ provided no additional

evidence supporting his credibility determination.  *See Carmickle v. Comm'r of SSA*, 533 F.3d

1155, 1162 (9th Cir. 2008) (error is harmless and does not warrant reversal so long as there is

"substantial evidence supporting the ALJ's conclusions on . . . credibility" and the error "does not

negate the validity of the ALJ's ultimate [credibility] conclusion") (quoting *Batson v. Comm'r of

Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).

## II.    Lay Witness Testimony

Briscoe also contends that the ALJ erred by rejecting the lay testimony of her husband,

Peter Poire-Odegard, and her naturopathic doctor, Julie Kahn.

### A.    Peter Poire-Odegard

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

into account, unless he or she expressly determines to disregard such testimony and gives reasons

germane to each witness for doing so."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

Friends and family members in a position to observe a claimant's symptoms and daily activities

are competent to testify as to her condition.  *Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir.

1993).  While a witnesses who views the claimant on a daily basis can often tell whether

someone is suffering or merely malingering, the testimony of those who see the claimant less

often still carries some weight.  *Id* at 919.  However, where a lay witness statement is similar to

the claimant's own subjective complaints, the ALJ may reject the witness statements for the same

reasons that the ALJ discounted the claimant's testimony, as long as the ALJ properly discredited

the claimant's testimony.  *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir.

2009).

Here, the ALJ accepted the portions of Poire-Odegard's statement that apparently undermined Briscoe's credibility, but rejected the rest because it was consistent with Briscoe's allegations. First, the ALJ reasoned that some of Poire-Odegard's statement actually described Briscoe as having fewer limitations than Briscoe described in her own testimony. The only example the ALJ provides is the apparent discrepancy between Poire-Odegard's and Briscoe's statements concerning Briscoe's practice of not emptying her cat's litter box. Tr. 18 ("he states that the claimant does not empty the litter box because it makes her nauseous, not because of any musculoskeletal symptoms.") Here, the ALJ badly misinterprets the record. Briscoe never stated that her symptoms prevented her from emptying the litter-box. Rather, she merely wrote that her "fiancé usually empties cat litter." Tr. 133. Thus, Poire-Odegard's statement that he takes care of the litter because it makes Briscoe nauseous is fully consistent with Briscoe's account.

Second, the ALJ rejected the remainder of Poire-Odegard's statements precisely because they were consistent with Briscoe's allegations, which the ALJ previously determined were not credible. Such a rejection is permissible, as long the ALJ's initial credibility determination is properly justified. *See Valentine*, 574 F.3d at 694. Here, however, the ALJ's reasons for disregarding Briscoe's testimony either lacked substantial supporting evidence or conflicted with controlling law. Thus, the ALJ improperly rejected Poire-Odegard's lay witness testimony because he predicated that rejection on other erroneous findings.

**B.     Julie Kahn**

Naturopathic doctors are considered to be "other sources" under the regulations, as

opposed to "acceptable medical sources" that reflect judgments about the nature and severity of a

claimant's impairments.  20 C.F.R. § 404.1513(a), (d); S.S.R. No. 06-03p, *available at* 2006 SSR

LEXIS 5, at *4.   Nevertheless, an ALJ must consider all relevant evidence, including opinions of

"other sources."   S.S.R. No. 06-03p at *4,*10.  Information from "other sources" cannot

establish the existence of a medically determinable impairment, but it "may provide insight into

the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.* at *5.

Moreover, the ALJ  "generally should explain the weight given to opinions from these 'other

sources,' or otherwise ensure that the discussion of the evidence in the determination or decision

allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions

may have an effect on the outcome of the case."  *Id.* at *16.

In his decision, the ALJ gave reduced weight to Kahn's opinion that Briscoe could not sit

more than 20 minutes at a time or work more than five hours each day because: (1) Kahn did not

provide objective findings supporting her conclusion; and (2) her conclusion was inconsistent

with objective medical findings and medical opinion in the record.  Tr. 18.  Briscoe, however,

argues that Kahn need not have provided objective findings supporting her conclusion because

fibromyalgia is a disease without an objective diagnostic test and that Kahn's opinion was

consistent with objective findings in the record.

I find that the ALJ did not err in giving reduced weight to Kahn's opinion.  In evaluating

opinion evidence from "other sources", the ALJ should refer to factors such as the length of the

treating relationship, the frequency of treatment, the opinion's consistency with other evidence,

the degree to which the source presents relevant evidence supporting her opinion, how well the

source explained her opinion, and the source's area of expertise.  S.S.R. No. 06-03p at *11.

Here, the ALJ properly based his decision on at least one of these factors: the fact that Kahn's

opinion was not supported sufficiently by relevant evidence.  *See* S.S.R. No. 06-03p at *12 ("Not

every factor for weighing opinion evidence will apply in every case.")  The ALJ correctly

observed that Kahn provided no objective basis for her opinion, since Kahn's note listing

Briscoe's restrictions is extremely brief and lacks supporting justification.  The ALJ properly

reduced the weight given to Kahn's opinion on that ground alone.  *See Tonapetyan v. Halter*, 242

F.3d 1144, 1149 (9th Cir. 2001) ("an ALJ need not accept a treating physician's opinion that is

conclusory and brief and unsupported by clinical findings.")

**III.    Remedy**

Given that the ALJ erred by improperly discrediting testimony from Briscoe and her

husband, the only remaining question is whether to remand for further administrative

proceedings or credit the erroneously rejected testimony and remand only for an award of

benefits.  The Ninth Circuit has clarified the standard for determining whether to remand for an

award of benefits:  "the district court should credit evidence that was rejected during the

administrative process and remand for an immediate award of benefits if (1) the ALJ failed to

provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues

that must be resolved before a determination of disability can be made; and (3) it is clear from

the record that the ALJ would be required to find the claimant disabled were such evidence

credited." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citing *Harman v. Apfel,* 211

F.3d 1172, 1174, 1178 (9th Cir. 2000)).

Page 39 - FINDINGS AND RECOMMENDATION

All three requirements for a remand for award of benefits are met in this case.  First, as discussed above, the ALJ rejected testimony from Briscoe and Poire-Odegard either without providing substantial evidence or in a manner contrary to law.  Second, there are no outstanding issues to be resolved before Briscoe may be found disabled.  One of the central issues in Briscoe's disability claim is the extent of her functional capacity.  Here, the record clearly shows that Briscoe's functional capacity is quite limited.  Briscoe's pain and fatigue curtail her ability to remain seated or standing for any substantial period and require frequent resting and daily naps.  Her symptoms and her pain medication also contribute to her general lack of concentration and memory problems.  Perhaps the best illustration of her reduced functional capacity can be drawn from her aborted attempts to work 10 hours per week as a receptionist in March through May 2008.  Despite stretching and moving around frequently, Briscoe experienced "pretty unbearable" pain at the end of her three and a half hour shift, with pain persisting for several days afterward. Tr. 504, 583.  She also tried to work multiple shifts in other weeks, but had to cancel all but her first shift because of pain.   Briscoe's inability to work more than 3.5 hours per week even in an accommodating workplace demonstrates the extent of her functional limitations.

Third, if Briscoe's and Poire-Odegard's testimony were credited, the ALJ would be required to find Briscoe disabled.  At Briscoe's hearing, the ALJ asked the vocational expert whether an individual with limitations such as Briscoe's would be able to perform any of Briscoe's past work.  Tr. 42.  The vocational expert opined that such an individual would be prevented from performing any work at any skill level, let alone Briscoe's past relevant work.  *Id.* Thus, crediting Briscoe's improperly rejected testimony would require a step five finding that

there are no jobs existing in significant numbers in the national economy that Briscoe could

perform.  In sum, remand for further proceedings is unwarranted and this case should be

remanded for a finding of disability.  *See Benecke*, 379 F.3d at 596 (where ALJ improperly

discredited testimony from claimant with fibromyalgia and evidence established that claimant

would be unable to maintain employment while managing her pain and fatigue, remand for

award of benefits was proper).


## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision be

reversed and remanded for a finding of disability and an award of benefits, provided that all

additional eligibility requirements for disability insurance benefits are met.  A final judgment

should be entered pursuant to sentence four of 42 U.S.C. § 405(g).


## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation.  If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

///

///


Page 41 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 14th day of March, 2011.

 /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge